IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MICHAEL VEGAS, | ) | CIVIL NO. 13-00641 SOM/RLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING MOTIONS FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| UNITED STEELWORKERS, LOCAL | ) | |
| 12-591; et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

I.       **INTRODUCTION.**

Plaintiff Michael Vegas alleges that he was wrongfully terminated by his employer and that his union did not fairly represent him in subsequent grievance procedings.  Defendants move for summary judgment, arguing that Vegas cannot demonstrate that his discharge was both contrary to the collective bargaining agreement and that his union breached its duty of fair representation.

This case involves what is known as a "hybrid" claim in the context of claims by unionized employees.  The record includes evidence supporting Vegas's employer's determination that Vegas fraudulently claimed to have been sent wrong items in a company-sponsored incentive program, that Vegas returned the items and sought to exchange them for more expensive items, and that Vegas lied during the employer's investigation of his actions.  Vegas's employer reasonably relied on FedEx packing

slips indicating that the weights of the items shipped to Vegas differed greatly from the weights of the items he returned, and on the unavailability of the items returned in the shipper's stock at the time the items were allegedly sent.  Based on this same evidence, Vegas's union, United Steelworkers, Local 12-591, rationally decided not to take Vegas's grievance to arbitration, instead deeming it unlikely that Vegas would recover in an arbitration and opting to settle the matter.  The court, concluding that Vegas identifies no triable issue as to his "hybrid" claim, grants summary judgment in favor of Defendants.

## II.        **FACTUAL BACKGROUND.**

Vegas began working for BHP at an oil refinery on the West side of Oahu on October 7, 1991.  See Deposition of Michael Vegas at 75-76, ECF No. 65-2, PageID #s 472-73.

Tesoro bought BHP in the mid-1990s.  Id. at 78, PageID # 474.  Vegas received Tesoro's Code of Business Conduct, Doing the Right Thing.  Id. at 79, PageID # 475; ECF No. 65-2, PageID # 491 (October 18, 2001, acknowledgment of receipt).  This code expressed Tesoro's "core values," including honesty and integrity.  Id., PageID # 494.  It required Tesoro employees to "Always obey the law and act in a professional, honest, and ethical manner when acting on behalf of or as a representative of the company."  Id., PageID # 504.  It also required Tesoro

employees to "Cooperate and tell the whole truth when responding to an investigation or audit." Id.

Clayton Tamashiro, a human resources manager for Tesoro, stated that Tesoro had a "safety incentive program" called "LOKAHI," which stood for "Leading Onward, Keeping All Employees Healthy & Industrious." See Declaration of Clayton Tamashiro ¶¶ 1, 2, ECF No. 65-3, PageID # 533. Through this program, Tesoro employees could earn points by completing approved safety activities, and the points could be redeemed for various rewards. The incentive program was run by an outside vendor, Inspirus, LLC, which provided for the online redemption of points. When a Tesoro employee redeemed points for merchandise, the merchandise was shipped directly to the employee by Inspirus, which was responsible for any return or exchange of the merchandise. Id. ¶¶ 2, 3, PageID # 533-34.

On or about July 2, 2012, Colleen Umathum of Inspirus informed Tamashiro of a possible fraudulent return by Vegas. Umathum told Tamashiro that, in January 2012, Vegas had returned a Bissell vacuum cleaner and had claimed to have redeemed his points for a more expensive Dyson vacuum cleaner. Umathon also told Tamashiro that, in June 2012, Vegas had returned a Lasko fan, claiming that he had redeemed points for a more expensive Dyson fan.

Umathum said that the shipping weights of the boxes sent to Vegas via FedEx were different from the shipping weights of the boxes returned by Vegas to Inspirus. For example, the box with the fan sent to Vegas weighed about 15 pounds, but the box with the fan Vegas returned weighed 4.5 pounds. Id. ¶ 4, PageID # 53; ECF No. 68-3, PageID # 325 (email from Umathum to Tamashiro). According to Umathum, FedEx records indicated that box with the vacuum cleaner sent to Vegas in January 2012 weighed 9.9 pounds, but the box he returned weighed 4.4 pounds. See ECF No. 63-8, PageID # 326. Umathum told Tamashiro that neither the Lasko fan nor the Bissell vacuum cleaner returned by Vegas was carried by Inspirus's distribution center. See ECF No. 63-8, PageID # 325. Inspirus appears to have offered some Lasko fans and Bissell vacuum cleaners, see ECF No. 81-2, PageID # 639 and 649 (copy of Inspirus's online catalog), but there is no evidence in the record that Inspirus carried the models Vegas returned or that those models were in stock at the relevant times. Umathum stated that, nevertheless, when the distribution center received the Bissell vacuum cleaner as a return from Vegas, it sent Vegas a Dyson vacuum cleaner. Id.

Tamashiro says that, based on the information from Inspirus, Tesoro initiated an investigation into possible misconduct by Vegas. See Tamashiro Decl. ¶ 4, ECF No. 65-3, PageID # 534.

On July 5, 2012, Tamashiro met with Vegas and Clyde Foreman, Tesoro's regional security manager, regarding Vegas's redemption of points and the return of the Lasko fan and the Bissell vacuum cleaner. See Tamashiro Decl. ¶ 5, ECF No. 65-3, PageID # 535. Asked about the differences in shipping weights, Vegas had no explanation other than to suggest that someone at Inspirus or FedEx may have switched the merchandise. In July 2012, Vegas was placed on administrative leave with pay pending further investigation. Id. Vegas says he grieved this suspension, although the court does not have before it an initial grievance document relating to the suspension. See Vegas Decl. ¶ 14, ECF No. 81, PageID # 632.

Article 19 of Tesoro's collective bargaining agreement governs the grievance process. Section 19.01 establishes a "Worker's Committee" with not more than five Tesoro employees. See ECF No. 63-20, PageID # 409. Under section 19.05 of the CBA, an employee is required to "seek direct adjustment with his/her supervisor" in a process called "Step One." Id. If the grievance is not resolved by the supervisor to the employee's satisfaction, a "Step Two" grievance may be instituted within 15 days of the supervisor's decision through a request by the Worker's Committee for a meeting with local management to discuss the grievance. Id. "The time and place of the meeting [would] be designated by the Local Management," which was to issue a

5

written decision within 14 days of the meeting.  Id., PageID
# 410.  Within thirty days of that decision, the union could
request arbitration, which would be "Step Three" of the grievance
process.  Id.

At some point after Vegas's suspension, Umathum told
Tamashiro that Inspirus had asked FedEx to look into Vegas's
claim that the wrong box had been delivered.  FedEx responded
that it found no evidence of tampering or of Vegas's receipt of
the wrong fan.  Umathum sent copies of the FedEx labels for the
shipping and return of the fans to Tamashiro.  Id. ¶ 6, PageID
#s 535-36.  The FedEx tracking label for the fan sent to Vegas
indicates that the box weighed 14.3 pounds.  See ECF No. 63-8,
PageID # 335; ECF No. 81-3, PageID # 645 (better copy of same).
The tracking label for the fan returned by Vegas indicates that
it weighed 9.5 pounds.  See ECF No. 63-8, PageID # 333.

On or about July 17, 2012, United Steelworkers notified
Tesoro that it wished to proceed to Step Two of the grievance
procedure for Grievance Number THC-007-12.  See ECF No. 81-7,
PageID # 656.  This document was copied to members of the
Worker's Committee.  Id.

No Step Two meeting with local management actually
occurred concerning Vegas's July 2012 suspension, possibly
because, on August 2, 2012, Tesoro terminated Vegas.  Tesoro had
determined that, in violation of its Code of Business Conduct,

Vegas had attempted to defraud Inspirus by returning products of a lesser quality and value than the ones shipped to Vegas. <u>See</u> Tamashiro Decl. ¶¶ 7, 9, ECF No. 65-3, PageID # 537; ECF No. 63-4, PageID # 307 (termination letter). Tamashiro says that, at the time Vegas was terminated, Tamashiro knew of no other Tesoro employee who had had "issues with product returns . . . to Inspirus." Supp. Tamashiro Decl. ¶ 3, ECF No. 96-3, PageID # 811.

On August 6 or 7, 2012, United Steelworkers filed a written grievance on Vegas's behalf, which was also given number THC-007-12 (the same number assigned to the suspension grievance). The August 2012 grievance sought to rescind the termination, to remove all record of the incident from Vegas's file, and to have Vegas reimbursed for lost wages. <u>See</u> Tamashiro Decl. ¶ 10, ECF No. 65-3, PageID # 538; ECF N0 81-6, PageID # 653 (copy of grievance); ECF No. 63-6, PageID # 311 (same). Because it has the same grievance number as Vegas's purported grievance of his suspension, it appears that this document amended the earlier grievance, assuming an earlier grievance existed, and became a Step One grievance relating to the termination.

On August 12, 2012, Tamashiro responded to the grievance, as required by the CBA's Step One grievance procedure. Tamashiro's response stated that Tesoro did not believe that Tesoro had violated any provision of the CBA. <u>See</u> Tamashiro

Decl. ¶ 11, ECF No. 65-3, PageID # 538.  On or about August 15, 2012, Tesoro sent a letter to Vegas's union denying any violation of the CBA.  See ECF No. 82-3, PageID # 701.

On September 12, 2012, Tesoro sent Vegas's union information and documents that the union had requested, including the information and documents obtained from Inspirus.  See Tamashiro Decl. ¶ 12, ECF No. 65-3, PageID # 538-39; ECF No. 63-8, PageID #s 319-51.

In a letter dated October 16, 2012, the union (through Patricia Koge) asked that Vegas's grievance, THC-007-12, proceed to Step Two of the grievance process.  See ECF No. 63-10, PageID # 359.  Tamashiro says Tesoro received that letter on October 22, 2012.  See Tamashiro Decl. ¶ 13, ECF No. 65-3, PageID # 539. That letter does not appear to have been a timely invocation of Step Two of the grievance process concerning Vegas's termination, as it does not appear to have been submitted within 15 days of Vegas's receipt of Tamashiro's response of August 12, 2012, as required by section 19.05 of the CBA.

On January 7, 2013, Tamashiro sent Vegas's union a letter indicating that its Step Two request was untimely.  See ECF No. 63-11, PageID # 361.  Gaylan Prescott, who worked for Vegas's union's international representative, says that, although Tesoro initially asserted the untimeliness of the Step Two grievance procedure request, Tesoro nevertheless "worked to

8

resolve" it.  See Declaration of Gaylan Prescott ¶ 13, ECF No.
63-19, PageID # 385.

At the beginning of 2013, Tesoro was preparing to shut
down its refinery.  It therefore met with the union to conduct
"effects bargaining" and to resolve all outstanding grievances,
including Vegas's.  See Tamashiro Decl. ¶ 14, ECF No. 65-3,
PageID # 539-40.  Tesoro put aside its procedural objection to
the timeliness of the request for a Step Two grievance
proceeding.  See Prescott Decl. ¶ 16, ECF No. 63-19, PageID
# 386.

Because Prescott thought Vegas would lose in any
arbitration and believed that settling the grievance was in
Vegas's best interest, the union proposed to settle Vegas's
grievance for $12,500.  See id. ¶ 22, PageID # 388; ECF No. 63-
14, PageID # 367.  A few weeks later, Tesoro made a counteroffer
to settle Vegas's grievance for $2,500.  See ¶ 22, PageID # 389.

On March 24, 2013, Patricia Koge of the union sent
Vegas an e-mail that mistakenly informed him that the union had
actually settled his grievance:

> We just completed effects bargaining and your
> grievance was "settled."
>
> The company disagreed with the union's
> position concerning your grievance and the
> union's representative felt it wasn't in the
> best interest of the union to arbitrate based
> on the merits of the grievance.

> The company argued that it was highly
> improbable that the vendor would send you the
> wrong items twice in a year and both times it
> was brands that they didn't stock/have.  They
> also cited the investigation conducted by
> Inspirus and FedEx stating that the
> difference in weight from what they sent you
> and the weight when returned (too big a
> difference), the label on the returned fan
> box appeared to have been removed and
> attached to the box sent back to them and
> questioned the probability of the companies
> (Inspirus and FedEx) conspiring to switch the
> item.  They were within their rights to
> terminate you because Inspirus is contracted
> by Tesoro to manage the awards program and is
> a "part" of the company.
>
> Our union representative felt that there was
> sufficient evidence on the company's part to
> make winning at arbitration very slim.

ECF No. 63-15, PageID # 369.

On April 6, 2013, Koge sent Vegas another e-mail stating that his grievance had not been settled because a counteroffer had been made.  See ECF No. 63-16, PageID # 372.

On May 24, 2013, Koge sent Prescott an e-mail explaining that Tesoro had made a counteroffer to settle Vegas's grievance for $2,500.  See ECF No. 63-14, PageID # 367.  Prescott responded that same day, "Pat, I do not believe we can prevail in arbitration with this grievance.  I would gladly accept the offer of settlement."  Id.

On May 26, 2013, Vegas sent Koge an e-mail that asked about the status of his grievance.  See ECF No. 63-18, PageID # 376.  Koge responded in an e-mail that may have been misdated

May 25, 2013, a day before Vegas had asked about the status of his grievance, that Tesoro was offering $2,500 to settle the grievance and that the union had accepted the proposed settlement.  Id.  It is not clear when Vegas read Koge's response.  Nor is it clear whether the e-mail dated May 25, 2013, was actually received on that date.  The only evidence definitively establishing Vegas's notice that his grievance had been settled is his e-mail of May 28, 2013, which stated that he was confused by the $2,500 offer.  Id.

On June 17, 2013, Koge sent an e-mail to Vegas, clarifying the reason that the union had decided to settle Vegas's grievance rather than arbitrate the matter.  Koge stated that Prescott would have handled the arbitration on Vegas's behalf and that Prescott thought that Tesoro would win at arbitration.  Accordingly, Prescott decided that it was in Vegas's best interest to accept the $2,500 settlement offer rather than get nothing via the arbitration process.  See ECF No. 63-18, ECF No. 378; Decl. of Gaylan Prescott ¶¶ 20-21, 23-25, ECF No. 63-19, PageID #s 387-90.  Prescott appears to have conferred with the union's lawyers in making this decision.  See ECF No. 63-18, PageID # 379.

Vegas filed the initial Complaint in this matter on November 22, 2013, 178 or 179 days after his e-mail of May 28,

2013, definitively establishing that he had received notice that the union was not going to take his grievance to arbitration.

In his deposition, Vegas was asked whether he had any complaints against the union, other than his dispute about the union's refusal to take his grievance to arbitration. Vegas indicated that he had no other issues with his union. See Depo. of Michael Vegas at 39, lines 9-23, ECF No. 65-2, PageID # 471.

**III.      SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2010). See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify

and dispose of factually unsupported claims and defenses.
Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).
Summary judgment must be granted against a party that fails to
demonstrate facts to establish what will be an essential element
at trial.  See id. at 323.  A moving party without the ultimate
burden of persuasion at trial--usually, but not always, the
defendant--has both the initial burden of production and the
ultimate burden of persuasion on a motion for summary judgment.
Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102
(9th Cir. 2000).

　　　　The burden initially falls on the moving party to
identify for the court those "portions of the materials on file
that it believes demonstrate the absence of any genuine issue of
material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp.,
477 U.S. at 323).  "When the moving party has carried its burden
under Rule 56(c), its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986) (footnote omitted).

　　　　The nonmoving party must set forth specific facts
showing that there is a genuine issue for trial.  T.W. Elec.
Serv., Inc., 809 F.2d at 630.  At least some "'significant
probative evidence tending to support the complaint'" must be

produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv.
Co., 391 U.S. 253, 290 (1968)).  See Addisu, 198 F.3d at 1134 ("A
scintilla of evidence or evidence that is merely colorable or not
significantly probative does not present a genuine issue of
material fact.").  "[I]f the factual context makes the non-moving
party's claim implausible, that party must come forward with more
persuasive evidence than would otherwise be necessary to show
that there is a genuine issue for trial." Cal. Arch'l Bldg.
Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468
(9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at
587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough
doubt for a 'reasonable trier of fact' to find for plaintiffs in
order to defeat the summary judgment motion.").

        All evidence and inferences must be construed in the
light most favorable to the nonmoving party. T.W. Elec. Serv.,
Inc., 809 F.2d at 631.  Inferences may be drawn from underlying
facts not in dispute, as well as from disputed facts that the
judge is required to resolve in favor of the nonmoving party.
Id.  When "direct evidence" produced by the moving party
conflicts with "direct evidence" produced by the party opposing
summary judgment, "the judge must assume the truth of the
evidence set forth by the nonmoving party with respect to that
fact." Id.

14

IV.     ANALYSIS.

A.     Hybrid § 301/Fair Representation Claims.

Vegas is claiming that Tesoro breached provisions of its collective bargaining agreement and that United Steelworkers breached its duty of fair representation.  In DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 163-4 (1983), the Supreme Court explained that employees have the right to bring suit against their employers for breaches of collective bargaining agreements, but the employees must ordinarily attempt to exhaust grievance and/or arbitration remedies provided in collective bargaining agreements.  Subject to very limited judicial review, these employees are bound by the finality provisions in collective bargaining agreements.  Id.  When a union representing an employee in the grievance and/or arbitration proceedings "acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion," that conduct amounts to an "unacceptable injustice," as it essentially prejudices the employee based on the lack of review.  The union is therefore said to have breached its duty of fair representation.

The Supreme Court recognized that, in such instances, an employee may bring suit against both the employee's employer and union, notwithstanding the finality of any grievance or arbitration proceeding.  Id.

15

> Such a suit, as a formal matter, comprises
> two causes of action.  The suit against the
> employer rests on § 301, since the employee
> is alleging a breach of the collective
> bargaining agreement.  The suit against the
> union is one for breach of the union's duty
> of fair representation, which is implied
> under the scheme of the National Labor
> Relations Act.  _Id._ . . . . To prevail
> against either the company or the Union,
> employee-plaintiffs must not only show that
> their discharge was contrary to the contract
> but must also carry the burden of
> demonstrating a breach of duty by the Union.
> The employee may, if he chooses, sue one
> defendant and not the other; but the case he
> must prove is the same whether he sues one,
> the other, or both.  The suit is thus not a
> straightforward breach of contract suit under
> § 301 . . . , but a hybrid § 301/fair
> representation claim, amounting to a direct
> challenge to the private settlement of
> disputes under the collective-bargaining
> agreement.

_Id._ at 165 (quotation marks, alterations, and citations omitted).

"A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." _Vaca v. Sipes_, 386 U.S. 171, 190 (1967).  The Supreme Court has explained that, for purposes of examining whether a union acted arbitrarily with respect to its duty of fair representation, a union breaches its duty only when its conduct "can be fairly characterized as so far outside a wide range of reasonableness that it is wholly irrational or arbitrary." _Marquez v. Screen Actors Guild, Inc._, 525 U.S. 33, 45 (1998) (quotation marks and citations omitted).

16

This court must first decide whether the union's conduct in handling the grievance at issue involved the exercise of judgment, or whether it was procedural or ministerial in nature. When an exercise of judgement is involved, a plaintiff can prevail on a duty of fair representation claim only when the union's conduct is discriminatory or in bad faith. However, when the union's challenged conduct is procedural or ministerial, a plaintiff can prevail on a duty of fair representation claim when the conduct is arbitrary, discriminatory, or in bad faith. See Wellman v. Writers Guild of Am., W., Inc., 146 F.3d 666, 670 (9th Cir. 1998); see also Wong v. Haw. Medical Ctr.-W., LLC, 2009 WL 3294794 (D. Haw. Oct. 14, 2009).

An employee has no absolute right to have a union take a grievance to arbitration. See Evangelista v. Inlandboatmen's Union of Pac., 777 F.2d 1390, 1395 (9th Cir. 1985). "A union's decision to pursue a grievance based on its merits or lack thereof is considered an exercise of its judgment." Stevens v. Moore Bus. Forms, Inc., 18 F.3d 1443, 1447 (9th Cir. 1994). "[U]nions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances." Id. In other words, unions are given "room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Id. at 45-46.

In <u>Air Line Pilots Association v. O'Neill</u>, 499 U.S. 65, 66-67 (1991), for example, the Supreme Court held that the union did not act arbitrarily such that it breached its duty of fair representation when it rationally settled a case, even though the settlement turned out to be a bad one for some employees.

The Ninth Circuit has further explained that, in evaluating a union's conduct, courts should recognize that unions have "substantial discretion" in making decisions because a union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance. <u>Dutrisac v. Caterpiller Tractor Co.</u>, 749 F.2d 1270, 1273 (9th Cir. 1983).

Even the case on which Vegas relied most heavily at the hearing on the present motions, <u>Kirbyson v. Tesoro Refining & Marketing Co.</u>, 795 F. Supp. 2d 930, 939, (N.D. Cal. 2011), notes, "A union's decision about how to best handle a grievance is generally a matter of judgment, as is its decision to not take a grievance to arbitration." A union does not breach a duty of fair representation merely because it settles a grievance instead of arbitrating it. <u>Vaca v. Sipes</u>, 386 U.S. 171, 192 (1967).

Therefore, ordinarily, an employee can show a breach of the union's duty of fair representation only when the union's exercise of judgment in refusing to pursue arbitration was discriminatory or in bad faith. See <u>Wellman v. Writers Guild of</u>

18

Am., W., Inc., 146 F.3d at 670.  Kirbyson does note, as Vegas
stresses, that a union may not ignore a grievance.  A disregard
of an employee's rights may, as noted by the district court in
that case, enhance judicial scrutiny of the unions action because
unions

> must conduct some minimal investigation of
> grievances . . . .  Consequently, when a
> union member brings a meritorious grievance,
> the union's decision to ignore that grievance
> or to process it in a perfunctory manner is
> considered a ministerial action that breaches
> the union's duty if it is arbitrary,
> discriminatory, or performed in bad faith.
> Nevertheless, a court reviewing a union's
> conduct will not find that the union has
> exercised its duties perfunctorily unless it
> has treated the union member's claim so
> lightly as to suggest an "egregious
> disregard" of her rights.

Kirbyson, 795 F. Supp. 2d at 940 (citations omitted).

### B.    Defendants Have Not Demonstrated that the Six-Month Statute of Limitations Bars Vegas's Claims.

The applicable statute of limitations for hybrid
§ 301/fair representation claims is six months.  DelCostello, 462
U.S. at 164-65 (holding that section 10(b) of the National Labor
Relations Act, 29 U.S.C. § 160(b), sets the applicable statute of
limitations for hybrid § 301/fair representation claims at six
months).  The limitations period begins to run when the employee
discovers, or in the exercise of reasonable diligence should have
discovered, the acts constituting the alleged violation.  See
Galindo v. Stoody Co., 793 F.2d 1502, 1509 (9th Cir. 1986).

Thus, "in a duty of fair representation case, the six-month period begins to run when an employee knows or should know of the alleged breach of duty of fair representation by a union." <u>Id.</u>

Defendants argue that Vegas's hybrid § 301/fair representation claim is barred by the six-month statute of limitations because he filed his original Complaint on November 22, 2013, more than six-months after he received an e-mail dated March 24, 2013, telling him that the union had settled his grievance. This argument ignores the union's e-mail to Vegas of April 6, 2013, which stated that Vegas's grievance had not been settled given a counteroffer. <u>See</u> ECF No. 63-16, PageID # 372.

In an e-mail dated May 25, 2013, Vegas was told that Tesoro was offering $2,500 to settle his grievance and that the union has accepted the offer. <u>See</u> ECF No. 63-18, PageID 376. There is no evidence establishing whether Vegas read this e-mail on the day it was sent. On May 28, 2013, Vegas sent an e-mail indicating that he was confused by the $2,500 offer. <u>Id.</u>

The record before this court does not establish that, when Vegas filed this action on November 22, 2013, that date was more than six-months from when Vegas knew that the union was not going to arbitrate his grievance. A statute of limitations defense is an affirmative defense with respect to which a defendant asserting the defense bears the burden of proof. <u>See</u> <u>Payan v. Aramark Mgmt. Servs. Ltd. P'ship</u>, 495 F.3d 1119, 1122

(9th Cir. 2007) ("because the statute of limitations is an affirmative defense, the defendant bears the burden of proving that the plaintiff filed beyond the limitations period"); Tovar v. U.S. Postal Serv., 3 F.3d 1271, 1284 (9th Cir. 1993) ("In every civil case, the defendant bears the burden of proof as to each element of an affirmative defense."); see also Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995) ("Because the statute of limitations is an affirmative defense, the defendant bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."). Defendants do not meet their burden on the limitations issue.

### C. Vegas Does Not Establish a Triable Issue Concerning a Breach of the Union's Duty of Fair Representation.

#### 1. The Union's Decision Was Supported by Rational Bases.

Vegas's First Amended Complaint does not clearly identify the wrongdoing he is alleging. See ECF No. 9. At Vegas's deposition, he was asked whether he had any complaints against the union, other than his complaint that the union had refused to take his grievance to arbitration. Vegas indicated that he had no other issues with his union. See Depo. of Michael Vegas at 39, lines 9-23, ECF No. 65-2, PageID # 471. It thus appears that Vegas is asserting a hybrid § 301/fair representation claim against his employer and his union based on

21

the union's failure to arbitrate his grievance concerning his termination.

To prevail against either his employer or his union under the hybrid § 301/fair representation claim asserted in the First Amended Complaint, Vegas must show both that his termination was contrary to Tesoro's collective bargaining agreement with United Steelworkers and that United Steelworkers breached its duty of fair representation. <u>DelCostello</u>, 462 U.S. at 165. Vegas has raised no question of fact as to whether the union's decision to settle his grievance rather than proceed to arbitration was a breach of the union's duty of fair representation. He offers no facts tending to show that the union acted in "a discriminatory, dishonest, arbitrary, or perfunctory fashion," <u>id.</u> at 164, or "arbitrary, discriminatory, or in bad faith." <u>Vaca</u>, 386 U.S. at 190.

United Steelworkers settled Vegas's grievance because it believed that Vegas could not prevail in arbitration. Gaylan Prescott was the union representative who would have represented Vegas in any arbitration. In thinking that Vegas would lose in arbitration, Prescott was relying on what he viewed as the improbability that Inspirus had sent Vegas incorrect items that it did not even have in stock twice in the same year; on the differences in the FedEx weights of the boxes sent and the boxes returned; and on Vegas's inability to credibly explain the weight

differences.  Prescott concluded that accepting the settlement offer of $2,500 was in Vegas's best interest.  These circumstances support the union's decision to settle the grievance as a rational exercise of judgment.  See Wellman, 146 F.3d at 670.

## 2. Vegas Does Not Establish Discrimination or Bad Faith by the Union.

Vegas does not meet the union's showing of the rationality of its decision with evidence of discrimination or bad faith by the union.  In fact, his attempts to do so backfire.

For example, he notes that the union was concerned that Tesoro was about to shut down the refinery and was pursuing "effects bargaining" under the circumstances.  But an impending refinery shutdown would have given the union greater justification for accepting a settlement.  And a shutdown would not have changed the facts underlying Vegas's termination, such as the evidence indicating that Vegas had returned items having a lesser value than the items sent to him.

Vegas says that employees at the refinery were facing layoffs, and Worker's Committee members might have benefitted from Vegas's termination by moving up the seniority ladder in Vegas's absence and therefore having greater protection from layoffs.  But these purported effects of terminating Vegas do not, without more, establish bad faith by the union in determining that it was unlikely that Vegas could get his job

23

back through arbitration. Vegas offers only speculation about
motives, which is insufficient to raise a genuine issue of fact
as to whether the union acted in bad faith. Certainly this court
must draw reasonable inferences in Vegas's favor, but this court
balks at finding it reasonable to infer bad faith on so thin a
reed.

Vegas also argues that bad faith on the part of the
union can be inferred because it is ludicrous to think that he,
an employee with a six-figure job, an unblemished employment
record, and a military career, would risk so much for something
like a $200 fan. But a person's record does not establish that
the person will never act wrongfully. A record reflects only
what the record-keeper knows about a person's past, not what a
person will likely avoid doing in the future. Vegas's record
does not raise a genuine issue of fact about whether the union
fairly represented Vegas under the circumstances.

### 3. Vegas Demonstrates No Viable Claim That the Union "Ignored" His Grievance.

Although Vegas stated at his deposition that his only
complaint with the union was that it did not arbitrate his
grievance, see Vegas Depo. at 39, lines 9-23, ECF No. 65-2,
PageID # 471, his Joint Opposition indicates that he is now also
complaining that the union "ignored" his grievance. See ECF No.
78, PageID # 599. To avoid unfairness to opposing parties, the
court does not normally allow parties to vary their claims from

24

those specifically identified or narrowed at depositions. Nevertheless, even if considered, Vegas's "ignoring" claim is an unavailing attempt to show that the union acted arbitrarily, discriminatorily, or in bad faith in the grievance process.

Article 19 of the collective bargaining agreement governs the grievance process. Section 19.01 establishes a "Worker's Committee" made up of not more than five employees of Tesoro. <u>See</u> ECF No. 63-20, PageID # 409. Under section 19.05 of the agreement, an aggrieved employee is required to "seek direct adjustment with his/her supervisor," in what is called "Step One" of the grievance process. <u>Id.</u> If the grievance is not settled by the supervisor to the employee's satisfaction, a "Step Two" grievance may be instituted within 15 days of the supervisor's decision by a Worker's Committee request for a meeting with local management to discuss the grievance. <u>Id.</u>

Although Vegas contends that the union did not quickly conduct a Step Two meeting as requested in the letter of July 17, 2012, that argument does not win the day. The July 2012 letter concerned a Step Two grievance relating to Vegas's suspension. Vegas was terminated shortly after the date of that letter, on August 2, 2012. Another grievance was then filed under the same number as the earlier one. This new grievance, addressing Vegas's termination, restarted the process at Step One. Thereafter, as discussed above, an untimely request was made for

a Step Two grievance proceeding relating to the termination. Under these circumstances, the absence of a Step Two grievance proceeding related to the July 2012 request was justified. Moreover, section 19.05 of the collective bargaining agreement did not require Tesoro to hold any Step Two meeting within a specified time from its receipt of a Step Two request. That section only says that, when a meeting is held, a written decision must issue within 14 days of the meeting. See ECF No. 63-20, PageID # 410.

Even with the waiver of the untimeliness of the Step Two grievance request relating to Vegas's termination, the court cannot find evidence that the union "ignored" Vegas's grievance to his detriment. The union and management ultimately met to discuss Vegas's grievance and agreed to settle his individual dispute. Although Vegas posits that a delay in negotiations caused him to receive a less favorable settlement, that assertion is not supported by actual evidence in the record. Vegas introduces no evidence indicating that, had the Step Two grievance meeting occurred earlier, he would have likely gotten his job back or been offered a higher settlement.

Nor does the record suggest that the union handled anything else relating to Vegas's grievance in such a perfunctory manner that its decision could be considered a ministerial action that breached the union's duty of fair representation by being

arbitrary, discriminatory, or in bad faith.  See Wellman, 146
F.3d at 671; Kirbyson, 795 F. Supp. 2d at 940.  A union does not
exercise its duties perfunctorily "unless it has treated the
union member's claim so lightly as to suggest an 'egregious
disregard' of her rights."  Wellman, 146 F.3d at 671.

At most, Vegas points to the union's failure to
interview Vegas's wife or to ask his coworkers whether they had
ever been sent wrong items.  As discussed above, the union had
enough evidence before it to conclude that Vegas would not likely
prevail in arbitration.  This is not a case turning on a failure
to investigate.  Even if Vegas's wife would have corroborated
Vegas's version of events, the union could have reasonably
concluded that Vegas's wife would have been viewed by any
arbitrator as having an interest in the outcome of any
arbitration, and that such an interest would have diminished the
value of what she said.  The union knew from Vegas's statement of
July 9, 2012, that Vegas's wife was with him when he went to pick
up the fan, and it is unclear what unexpected information might
have been obtained by interviewing her.  With respect to
coworkers' receipt of wrong items, the court has no evidence that
the union ever discounted the possibility of errors by Inspirus.
Rather, the union thought it unlikely that an employee would
receive wrong items twice in a year, especially if the items were
not in stock and the shipping weights varied.  Gathering data of

other shipping errors would not have addressed that constellation of circumstances.

In <u>Kirbyson</u>, 795 F. Supp. 2d at 941, relied on heavily by Vegas at the hearing, the Northern District of California court noted that, even though the union in that case could have more zealously pursued a grievance, that failure did not rise to the level of egregious disregard for a union member's rights such that it could be said to have failed to conduct a minimal investigation. The circumstances presented here similarly show no egregious disregard for Vegas's rights.

Finally, Vegas complains that, after Tamashiro sent Patricia Koge his response to the Step One grievance, no one from the Worker's Committee contacted him. <u>See</u> ECF No. 78, PageID # 600. But Koge, who was both a unit chair and a member of the Worker's Committee, did send an October 16, 2012, letter requesting a Step Two grievance proceeding. <u>See</u> ECF No. 63-10, PageID # 359. <u>See also</u> Supp. Prescott Decl. ¶ 3, ECF No. 95-1, PageID # 773. While this Step Two request was untimely, Tesoro ultimately waived the untimeliness, so that Vegas cannot now identify any actual prejudice.

Finally, Vegas contends that the $2,500 settlement amount was so low that it represented a bad faith settlement. Facing a high probability of losing in arbitration, the union

decided that accepting $2,500 was better than nothing.  Vegas presents nothing more than his bare assertion arguing otherwise.

Because Vegas does not raise a genuine issue of fact as to whether the union's decision to settle his grievance rather than take it to arbitration was arbitrary, discriminatory, or in bad faith, Defendants are entitled to summary judgment on the hybrid § 301/fair representation complaint that the union refused to arbitrate Vegas's grievance.

### D.   No Breach of the Collective Bargaining Agreement Has Been Shown.

There is no dispute that, under section 19.07 of the collective bargaining agreement, Vegas could only be suspended or terminated based on "just cause."  As described above, there is no genuine issue of fact as to whether Tesoro suspended and terminated Vegas for just cause.  Tesoro had a basis for concluding that Vegas had attempted to commit fraud in one of its employee programs.  The implausibility of his explanation also caused Tesoro to believe that he was lying during the investigation process.  Accordingly, besides being entitled to summary judgment because Vegas fails to show that the union's decision was arbitrary, discriminatory, or in bad faith, Vegas's union and his employer are entitled to summary judgment on his hybrid § 301/fair representation claim because Vegas fails to raise a genuine issue of fact as to whether he was terminated for "just cause."

### E. Vegas's Employer, However Named, is Entitled To Summary Judgment.

Vegas complains that Tesoro Hawaii Corporation is the entity seeking summary judgment, but that he is suing Tesoro Corporation, the 100% owner of Tesoro Hawaii Corporation, and its successor and its subsidiary, Par Petroleum Corporation and Hawaii Independent Energy. Vegas says his employer was Tesoro Corporation, a matter he says is established by the use of Tesoro Corporation letterhead on the letter transmitting the employee code of conduct. See ECF No. 65-2, PageID # 491. Vegas also argues that Tesoro Hawaii Corporation became Tesoro Hawaii LLC.

Vegas's arguments concerning which corporate entity was his employer make no difference to the adjudication of this motion, although the court does note that the collective bargaining agreement was with Tesoro Hawaii Corporation, the movant before the court, and that the Tesoro Corporation letterhead that Vegas points to arguably only shows that the entire Tesoro family of companies shared the same code of conduct. See ECF No. 63-20. Because Vegas cannot demonstrate that United Steelworkers breached its duty of fair representation or that he was terminated without "just cause," Vegas cannot maintain a claim against his employer, whatever entity that may be, as the identical elements are required for hybrid § 301/fair representation claims against employers and unions. See DelCostello, 462 U.S. at 165. Whether the employer is Tesoro

Corporation or Tesoro Hawaii Corporation, both the employer and the union are entitled to summary judgment because Vegas cannot prove essential elements of his claims.

**V.      CONCLUSION.**

The court grants the motions for summary judgment and the joinders therein filed by United Steelworkers and Vegas's employer.  Vegas fails to raise a genuine issue of fact as to whether the union breached its duty of fair representation or whether his employer terminated him for "just cause."

The Clerk of Court is directed to enter judgment for Defendants and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 18, 2014.



    /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Vegas v. United Steelworkers, Local 12-591, et al., Civil No. 13-00641 SOM/RLP; ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT UNDER RULE 60(b)(4) OF THE FEDERAL RULES OF CIVIL PROCEDURE

31